Case 12-6598, the Contributor et al. v. City of Brentwood, Oral Argument, Not to Exceed 15 Minutes per Side, Mr. Vennick for the Appellant. May it please the Court, my name is Erwin Vennick, representing the Appellants, and I'd like to reserve two minutes of rebuttal time. The City of Brentwood, Tennessee enacted an ordinance that imposes an absolute ban on the transfer of newspapers and other items to occupants of motor vehicles. The District Court below denied Plaintiff's motion for summary judgment and granted the City's motion for summary judgment, finding that the ordinance survived the Appellant's constitutional challenge. The only issue raised on appeal is whether the District Court properly considered whether the ordinance left the Contributor and its vendors ample alternative means to distribute their message. Because the District Court applied the wrong analysis, the judgment below should be reversed. Applying an intermediate scrutiny analysis, the District Court failed to hold Brentwood to its burden of proving that the ordinance is a reasonable time and place in matters of restriction. That analysis has two elements. The first element is that the ordinance is narrowly tailored, which Appellants are not challenging. The second is that the ordinance leaves ample alternative means of communication. In holding that it did, the District Court erred by including means of communication that are not used by the Contributor and its vendors. The analysis the District Court should have used would have considered those methods which are used by the Appellants and then determined whether, given those methods, the ordinance leaves the Appellants reasonable opportunity to communicate their message. The problem is that the ordinance does not leave ample alternative means used by the Contributor and its vendors for communicating its message. The ordinance is an absolute ban without so much as a free speech zone used in other First Amendment cases. The burden of proving ample alternative means is on the City of Brentwood. The first step is to determine what means are used by the Speaker to convey its message. Based on the record, the essence of the Contributor message is to create a connection between homeless vendors and the public. The message is conveyed through the physical distribution of a newspaper, which contains news reports, analysis, and cultural offerings that speak to the issue of homelessness. The physical distribution of the newspaper creates a personal interaction between homeless vendors and the interested public. Through the sale of the newspapers, vendors are then able to earn a living and support themselves. Consistent with this message, traditional means of newspaper distribution are not used by the Contributor. Therefore, it doesn't use news racks. It doesn't use general distribution email. It doesn't use an electronic website. Because those methods don't allow for the personal interaction between a vendor and an interested supporter. Even if we accept the premise that there has to be a personal inner reaction, it can't be an inert object like a mailbox or something like that, why does it have to be somebody sitting in a car? Well, because that is one of the means that the Contributor uses. I understand that it's one of the means, but to say that's one of the means, that's the means we like. We've never tried any other means, so therefore you're violating our First Amendment rights seems to change the standards here. Well, the Contributor does use other methods. In the city of Nashville, the vendors can use sidewalks, and use sidewalks regularly. The problem here is that Brentwood has no sidewalks. There was no proof put in the record, Your Honor, that there were any sidewalks in the city of Brentwood from which vendors could distribute a newspaper. I will concede that if there were sufficient sidewalks in Brentwood for Contributor vendors to sell their newspapers, we wouldn't be here today. I misunderstood that. I thought that I read that there simply was, in your view, inadequate pedestrian traffic on the sidewalks. In other words, there are more people driving down the street in a car than there are walking down the street on the sidewalk. Apparently, I misunderstood that. No, our position, Your Honor, is that there is insufficient pedestrian traffic, but there also is no proof of how much sidewalk space there was in the city of Brentwood. So seriously, if I just go on Google Maps and look down on Brentwood, I'm not going to see sidewalks? Your Honor, there's nothing in the record that was presented by the city of Brentwood that quantifies that there were 100 feet, 200 feet, 3 miles, 5 miles of sidewalk space in the city of Brentwood. Okay, that's fine. It's not there. But you're standing here. You're standing here as an officer of the court. You're telling me that whole city doesn't have sidewalks? They just got roads and lawns? That's it? Your Honor, based on our investigation, this is not part of the record. We found one space in Brentwood that was maybe 100 feet long. But it's not in the record, Your Honor, because Brentwood didn't present any proof of how much space there was in the record. And the burden is on Brentwood from our perspective for them to show that there is an available means that's used by the contributor through which it can distribute its message. And as I said, if Brentwood had— Let's assume that you're right. The burden is on them. They're relying upon sidewalks for their argument. They didn't meet their burden. But if you're wrong about the burden of proof, then you didn't address it either. You just simply say, well, we don't want to do anything else. Well, Your Honor, I believe that the case law is pretty clear that the burden of proof is on Brentwood to prove that there are ample alternative means. We don't have to come in there and show that we could have done it here or done it there. We would have to respond to Brentwood if, in fact, they come forward and they demonstrate to us that within the existing means that are used by the contributor and its vendors, there are ample alternative means. But I think the Lim case, even the Renton case, holds that the burden is upon the government to show that there are ample alternative means within the means that are used by the speaker, within the means used by the speaker, through which they can communicate their message. In what case do you have that conflates those two subjects, that they have the burden and the burden is limited to within the means used by the speaker? There are a lot of different cases from which you can select different snippets. Sure, Your Honor. And then you combine them as to say, well, that's just an accepted test that combines both disparate phrases from a bunch of cases. Bear with me for one second, Your Honor. Brentwood's a fairly wealthy suburb of Nashville, is it not? It is, Your Honor. I believe the Sague case, which is cited by the city, which really doesn't get to the issue of ample alternative means, but I think the Sague case does, in fact, have a reference in it where the Sixth Circuit makes reference to the fact that we're looking at the means that are used by the speaker. Yes, Judge Watson, Brentwood is a very wealthy suburb south of Nashville. Brentwood also suggested some other means through it that the contributor could use, pedestrian sales, public buildings, private property, door-to-door. But the record is clear, again, that none of these means are used by the contributor. And, therefore, should not be considered as part of the message. And the principle case you're relying upon that says this inquiry is limited to the means used by the person claiming the First Amendment right is which? Well, no, Your Honor. I mean, I think the Weinberg case holds that, which is cited in our brief. I think the Berry case holds that. And I think there is a reference in the Sague case, Sague versus city of, and I can't recall the name right now, Your Honor. Sague is only cited on one page of your brief only to set forth standards and doesn't discuss any of the things. You don't cite it for any of the things you're talking about. No, Your Honor. Well, Your Honor, you were asking me a question as to where I think that might exist. And, of course, preparing for today, I came across language in Sague which I believe conflates those two. The city of Brentwood relies upon, heavily relies upon the prime media and bench billboard cases. But we would hold, Your Honor, that those cases are not controlling. And, in fact, those cases are interesting. They're not controlling because, again, the starting point needs to be the means through which the contributor and its vendors are using to convey its message. Both of those cases involve companies that are involved in general advertising that were already using alternative means of communication. So then the question goes to what is a reasonable or ample means that is left for the contributor and its vendors. The first point we would make, Your Honor, is that there has to be an existing method. And, again, that's the Weinberg case, the Berry case as well. Some cases refer to an analysis based upon the percentage of sales. In the Burlington case, which both of us cite, there was proof in that case that the hawking of newspapers only contributed to 3 percent of total sales. And the court in that case held that 3 percent wasn't significant in terms of the ample alternative means analysis. And, of course, in adult entertainment cases, the proof generally is that there are parcels that exist, and there are a sufficient number for the speaker in that case to find a place where they can communicate their message. Now, as we pointed out in our brief, this is a case of first impression in two respects. First, it's a hybrid of two First Amendment interests. The first is we're talking about a street or homeless newspaper, which has a particular interest and a particular way of communicating, as I described. It also implicates panhandling and charitable contributions. We're not aware of any cases, state or federal, addressing the First Amendment challenge to government restrictions on the distribution of a street or homeless newspaper. Could I go back to what you said a moment ago about how the contributor does use a different means of communication in a different city? I've forgotten which city. It's Nashville. So Nashville you use sidewalks. Correct. Because there are sidewalks. Correct. Are there any other means of distribution used in other geographic areas beyond handing it to people in cars or handing it to people on sidewalks? No, Your Honor. So they don't try other things any other place? No. All right. I mean, that's the way the contributor has built its distribution. I got that. The record does reflect, I believe, that you do have a small subscription readership. There are 11 subscriptions. Now, those subscriptions, two of them, I believe, go to prisoners. I did say small. Well, I use 11 because, as the record points out, the contributor has 125,000 issues per month. So, I mean, it's not even small. I would say it's infinitesimal. But they're really very particular. They basically go to two institutions. They go to writers of the paper. They go to prisoners, and they go to one person who doesn't have access to a vendor. So that's where those methods go. So, from our perspective, this case presents the court with appellants' unique First Amendment interest in the face of a total ban of their protected activity by the city of Brentwood. The clear message of First Amendment jurisprudence is that the interest of government must be balanced against the First Amendment rights of citizens. The Brentwood Ordinance does not balance an asserted interest in any way because it's an absolute ban. The Brentwood Ordinance imposes an unconstitutional ban on the street-side sales of newspapers to the occupants of vehicles in Brentwood without leaving ample alternative means of communication for its message. For these reasons, the appellants request that the judgment granted in favor of the city of Brentwood be reversed, in this case, remanded. Thank you. Good morning, Your Honors. Robert Burns of the Nashville Bar. I represent the city of Brentwood in this case. With me in a representative capacity, actually, is the man who wrote the ordinance in question, Mr. Roger Horner, the city attorney and the city mayor, Betsy Crosley. I didn't anticipate that this case was going to come down to a question of length of sidewalks or whether sidewalks are present or not, and we submit that that is not the issue. And I would also suggest that the court can take judicial notice that there are sidewalks within the city of Brentwood. How can that not be an issue? The whole case deals with alternative means of distribution. That is true, but for points of clarification, to begin with, there are sidewalks in Brentwood. And in terms of ample alternative means of communication, the city's position is that the standard is not that the contributor is entitled to get the best or the only means of communication in which they engaged. Rather, the question is whether there are reasonable opportunities for them to communicate. And we submit that there are. To begin with, there are sidewalks in Brentwood. They do not avail themselves of any opportunity that the sidewalks may present. There are shopping centers in Brentwood, and the proof in this case is undisputed that they have never made any type of effort to interact with any individual or to try to secure or gain permission through a shopping center or in a private business area. One of the issues that arose... It's not unusual for shopping centers to prohibit solicitations and distributions. If you're going to hold that out as a possibility, don't you at least have to know whether they're available? Well, I think you do, but that burden is on the contributor. It's not on us. We think that it's a little silly at best to suggest that the burden is back on the city for the city to have to undertake some sort of investigation as to whether this means is available or not when the contributor itself won't even engage in that type of activity. I mean, the record before you is clear. It's undisputed on several of the points in terms of the activity that they have not undertaken. And we think that it's weak, it's disingenuous, if you will, to bring this suit and to argue that ample alternative means of communication are there, yet they haven't even tried it themselves. How is it that the city practically, on a logistical or some type of administrative basis, how is it that we are supposed to put in proof in terms of vendors going out into the city and whether they can do that or not when the contributor itself will not undertake that activity? Let me suggest to you that if you're going to claim that this ordinance is valid because there are alternative means, it seems to me at a minimum you have to at least say what those alternative means are. I understand that your argument is you then don't have to also go take the additional step of proving that those claimed alternative means are adequate. I get that. Yes, sir. But at least you have to come forward, it seems to me, and say what those alternative means are. Now, if you're saying that they're sidewalks, then strikes me that knowing whether there are sidewalks would be a nice thing to know. If you're saying they are shopping malls, it seems to me whether there are shopping malls, how many there are, and whether they do or don't prohibit handbills and that kind of thing, that would be nice to know. Why is that unreasonable for at least you to include in, I guess we would call it an affirmative defense? That's not unreasonable, and there's proof in the record to that effect through the city's former manager, Mr. Mike Walker. There's an affidavit that we put into the record that includes many geographical pieces of information that Mr. Walker signed off with respect to his affidavit. Can we find a Walker affidavit? I don't think you refer to that in your briefs, do you? It is in there, and the statistical information is part of the factual summary. The Walker affidavit is? Yes, sir. It is. Do people actually use the sidewalks in Brentwood? They do, but admittedly, as in Nashville, there's less pedestrian traffic. The communities in which we live in Middle Tennessee is largely based upon automobiles. That is the reason that the issues came up to begin with in this case, because while the contributor wants to say that they will engage in sales to pedestrians on sidewalks, the practical reality is that the clear majority of their transactions involve motor vehicles, and we've kind of laid waste to the issues regarding public safety, traffic safety. There's no dispute on that now. Judge McKeague, I'd like to get back to your point about other alternative means of communication. One of those that we have affirmatively put forward in the briefing and before the district court in the record is the possibility of door-to-door sales. There is proof in the record before you in terms of the size of the city. It's 42 square miles. Population in 2010 through the census then was 37,000 people. There are approximately 12,500 housing units within the city of Brentwood. That equates to 900 people per square mile. There has never been any attempt made by the contributor. They admitted this in their depositions. There's never been any effort made to allow vendors or to encourage vendors or to suggest to vendors that they attempt to go door-to-door within Brentwood. And if their modus operandi, if their real goal and their real target is the ability or the opportunity to try to communicate, to share their message, to tell people what it is that they're about and what they're trying to accomplish, we would submit that it is much easier and would be much more efficient and clearly without question much more safer to do that in a neighborhood, in someone's yard, on a sidewalk, in a subdivision, in a driveway, or on someone's porch as opposed to trying to do it. These distributors are homeless people, right? They say they are. They're either homeless or nearly homeless, but that did not... So you really claim that there's as equal or better chance that the person in this suburban house is going to look through their door, see a homeless person on the step, and they're going to open the door and engage in a conversation as contrasted with maybe rolling down their window, taking a newspaper, rolling it back up. Yes. That's your argument. Yes. I contest that that's an opportunity, that that is another means of communication in which they can engage. Another one that was not the focus is the fact that there are a number of churches in the city of Brentwood. There is a church literally located on every arterial street in Brentwood. There is a major church that is known as First Baptist Church of Brentwood on Concord Road in the geographic center of the city. Within a half to one square mile radius, probably a five to ten minute walking distance, are four to five other churches of similar size. Brentwood Baptist could be described as a mega church. It has thousands of members in it. It is a huge church. When the church relocated several years ago and then added on with an expansion, they requested and received approval to have their own traffic signal put in front of their church. There are thousands of people that go to that church on Sunday day services, Wednesday evening services. There is nothing at all that would preclude the contributor, especially with the goodwill that the contributor as an organization has generated in the Nashville community, of trying to make contact with church leaders to make arrangements to where vendors could go onto the private property but could interact with church members in the very large parking lots or standing on the church property as people come in or out of churches. Surely, if there is a captive audience or a target market that they would like to be able to interact with or to attract, I cannot imagine a better group of people that are available. It limits them to Baptists, though, doesn't it? Well, for the record, I'm not suggesting that it be limited to Baptists. There's not a freedom of religion issue in this case, as far as I know, and Brentwood is a multi-denominational city, if you will. But the point is the burden is not on us to try to demonstrate how they should do their business or what they think is the best means in which they need to engage. In that respect, they're no different than any other type of commercial entity or business that comes into a market or comes into a particular community. There are certain parameters and laws and guides, if you will, that despite their claim for First Amendment protection and despite their admitted and acknowledged goodwill in terms of what their mission is, they still have to comply with what the constitutional limits are and what the First Amendment requirements are. Courts have consistently held, courts in the circuit have held, that the standard is that they are not guaranteed the best means that is out there. Rather, they are given a reasonable opportunity. And all of these other alternative means of communication, which we have talked about, be it door-to-door sales, be it sales through or at the various churches that are in Brentwood, sales that are in parking lots. I'm sure it's the same here in Cincinnati, but throughout Middle Tennessee, Goodwill Industries has their trailers that are set up in various parking lots in front of the Kroger shopping centers. Just out of curiosity, I've been a little surprised by your reliance upon alternative means of communication involving private property. I didn't anticipate the turn that that argument would take. Plaintiffs cite this case from the Second Circuit called Berry v. City of New York, in which the Second Circuit says that you are entitled to an adequate alternative public forum for your means of communication. So how does that square with, say, I'm not sure how going door-to-door fits with public because you're on private property, but surely saying you're going to go to a private mall or you're going to go to a private church doesn't seem to square with Berry. Well, if we want to talk about the public areas that are in Brentwood that would be available, one, we can go back to the sidewalks to the extent that they're considered part of the public right away. I would also cite the court's attention to the fact that Brentwood has a very extensive and very, very well-developed public park system. There's an extensive system of trails, bike trails, hiking trails, and the like, that are throughout the city. The city has a very active program of a concert-in-the-park type series. Virtually all of the ball fields, the sporting fields that are in the city, are used at various times by soccer clubs, baseball clubs, lacrosse clubs. Those parking lots that are associated with all of those areas are public areas that would be open and available to any vendor that could come in as long as they comply with the terms of the current ordinance, the revised ordinance, in terms of no direct interaction with individuals that are in cars from either being in the street or being in part of the public right-of-way. Mr. Burns, were there a spate of accidents involving these people? In Brentwood that led up to the citations, no. So, what's the legitimate governmental interest in this case? Well, it's preventing the type of horrific accident that can occur and will likely occur by having someone standing in the roadway engaged with someone in a car. Don't they normally encounter these people when there's a red light and the cars are stopped? They do, and in the record there is ample evidence that we've put in that demonstrates the literal risk of vending itself. That is not an issue, respectfully judged, because they have admitted that vending in the street is dangerous. Can be. Can be. Can be, certainly. In conclusion, I would offer that, one, we do not believe that the burden is on the city of Brentwood to the extent that a contributor wants to make it out. It is difficult to conceive how it is that the city could go out and essentially do the work that they ought to do themselves in terms of there being other alternative means of distribution or communication. I think common sense and logic also dictate that if their true goal is to have an opportunity to be able to interact and to be able to speak and to have the time and not be under the pressure-type situation that they run into if they're vending on or near the street, then certainly door-to-door sales, sales in other less hazardous, less risky types of environments, be it other sidewalk areas, other public areas, church grounds, in front of other commercial entities. Your Honor, one point to get back to with you on an issue that you raised is that, yes, I certainly acknowledge that owners of private property or shopping malls or developments or things like that, they can certainly have the right or certainly may exercise their discretion to say, no, we do not want to vendor here. But that is no different than an occupant of a car not rolling down his or her window and saying, I don't want to deal with you right now. I don't want to buy a paper. I don't want to hear your story. I don't want to talk to you. But I think we can all take notice of the fact that there are circumstances, for example, Salvation Army, the Cub Scouts, the Boy Scouts, there is certainly the possibility that there are owners of private property that would be open to an organization like the Contributor. And I would further submit that the opportunity to go onto the grounds of churches within Brentwood is another ample alternative means of communication. Were there citizen complaints that led to the change of this ordinance? Not really. There were some that were generated through e-mail, the discovery that we had. There were a few. But the reason that it was generated, the reason that the change to the ordinance came about was because of the citations that were written and then the constitutional questions and challenge that came up through the vendors that had been cited. And that's what prompted. That's the reason for the amended ordinance. It is. Obviously, there couldn't have been citations unless there was already an ordinance. Well, there was. There was an ordinance that had been on the books that was extremely restrictive. And Mr. Horner very quickly saw that, acknowledged that, realized that. And in response to the constitutional questions that came up in early 2011, I guess, after the citations had been issued, he very rightly so recognized the issue and decided to revise it and to clean it up and produced what we believe is the constitutional ordinance today. Thank you. Thank you. Mr. Vernick, did you reserve time? Let me just address a couple of points raised by Mr. Burns. First, Your Honor, you asked a number of questions regarding availability within the city of Brentwood. Let me refer the court to the appellee's brief. It's at page 17 of the appellate record. It refers to Mr. Walker's affidavit. Let me just summarize what Mr. Walker says in his affidavit. Ninety percent of the geographic area in the city of Brentwood is dedicated to residential and permanent open space, no specification regarding public buildings, no specification regarding parks. It makes reference to 12,500 housing units, talks about a housing density of 900 persons per square mile, talks about retail sales. That's it. Nothing further. I would also suggest to the court that the whole argument that Mr. Burns made this morning regarding churches is nowhere to be found in the record of this case. Nowhere. That's new information for the court. And, Your Honor, I would suggest that you hit the nail on the head as far as the accessibility and the ample alternative, and that is the very case holds. What we're talking about is the public fora, not the private fora. We have no control over what happens in the private market. Permission today could be taken away tomorrow. What we're talking about is the accessibility of the contributor and its vendors to the public flora. Brentwood imposes an absolute ban on the distribution of the contributor's newspapers to occupants of motor vehicles with not even an effort to provide any kind of free speech zone. For that reason, we believe the court was in error below. We would ask the court to reverse the decision. Just out of curiosity. Yes, Your Honor. How, in the context of your desire to distribute these papers to people in cars presumably going to work or going to the shopping, wherever they're going, what would be an alternative free speech zone? Well, for example, Your Honor. How would that? I understand maybe a site with somebody that's standing up on a box speaking on a corner. Sure. But how do you provide it for what you want to do? Well, there are areas of Brentwood, and I think this is in the record, Your Honor, where there are areas of less vehicular traffic than more vehicular traffic. Now, it doesn't take too much to say, well, if we're concerned about high areas of vehicular traffic, let's first of all carve out, you know, and say we're not going to allow this in the downtown area of Brentwood to the extent that there is a downtown area. So you'd be satisfied subject to the carve out if they let you do it on some corners and not other corners? Well, Your Honor, we wouldn't be satisfied, but I think that is a much more consistent position, given the case law, than an absolute ban everywhere in the city of Brentwood, streets that are busy, streets that are not busy. Aren't you going to then argue that if they let people get whacked by cars on less busy streets, therefore they should let them get whacked by cars on busy streets? I'm not sure I mean whacked, meaning what way? The whole idea here is it's dangerous. These people are going to get run over by cars. Well, Your Honor, we disagreed with the position that this was such an inherently dangerous practice that it should be absolutely banned. We recognize that there is obviously danger any time anybody walks down the street. There was no proof in the record that really focused on the number of accidents that occurred to individuals who were standing by the side of the street. Now, we decided that it was not, given the case law and given the deference that's given to jurisdictions to decide what's in their best interest, we didn't think it was a prudent use of judicial time to address that issue. Occasionally we apply common sense. Well, I understand. I think we've got it. Thank you very much, Your Honor. Thank you. Thank you.